## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CHILDHOOD LEUKEMIA FOUNDATION, INC., a New Jersey corporation,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**FEDERAL TRADE COMMISSION, a Federal Administrative Agency,**<br><br>**and**<br><br>**LINA M. KHAN, REBECCA KELLY SLAUGHTER, and ALVARO BEDOYA, in their official capacity as Commissioners of the Federal Trade Commission,**<br><br>    **Defendants.** | CIVIL ACTION #<br><br>**COMPLAINT** |

COMES NOW the Plaintiff, Childhood Leukemia Foundation, Inc. ("Plaintiff" or "Childhood Leukemia Foundation" or "Foundation") by and through undersigned counsel, and for its Complaint seeking declaratory and injunctive relief against Defendants Federal Trade Commission ("FTC" or "Defendant" or "Commission") and Commissioners of the FTC, Lina M. Khan, Rebecca Kelly Slaughter, and Alvaro Bedoya, pleads as follows:

### I.    INTRODUCTION

1.    This action is necessitated by the Commission's unauthorized issuance of a Civil Investigative Demand ("CID") to Childhood Leukemia Foundation, Inc., a New Jersey non-stock, non-member, and not-for-profit corporation whose mission is dedicated to educating, empowering, and elevating children who are suffering with childhood cancers.

1

2.      Throughout Childhood Leukemia Foundation's 31 years of existence, it has provided assistance to tens of thousands of children and their families living with all types of cancers.  In fact, Childhood Leukemia Foundation has never denied a requested program benefit to a child.

3.      As stated in Childhood Leukemia Foundation's Certificate of Incorporation, the Foundation "has been organized and shall be operated exclusively for purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code."

4.      Similarly, Childhood Leukemia Foundation's Bylaws provide:

> No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, its members, trustees, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth [herein].

5.      In fact, upon Childhood Leukemia Foundation's dissolution, the Bylaws instruct that its assets be distributed for "one or more exempt purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state of [sic] local government, for a public purpose."

6.      Consistent with the foregoing, in September 2003, the Internal Revenue Service issued a determination letter that recognized Childhood Leukemia Foundation as an organization exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. Likewise, in 2007, the Internal Revenue Service confirmed that Childhood Leukemia Foundation maintains its tax-exempt status, is classified by the IRS as a "public charity," and that all donations made to it are tax deductible.

7.      Childhood Leukemia Foundation has complied with all requirements associated with maintaining its tax-exempt status and as a "public charity."   For example, Childhood

2

Leukemia Foundation files Form IRS 990, Return of Organization Exempt from Income Tax, with the Internal Revenue Service on an annual basis. These forms show, among other things, money in and money out, thereby substantiating that the entity is not operating for its own profit.

8. The Internal Revenue Service has never called into question Childhood Leukemia Foundation's status as a "public charity" or its tax-exempt status.

9. Additionally, Childhood Leukemia Foundation's financial books and records are audited by an independent outside auditor on an annual basis. Since inception, three independent auditing firms have concluded on an annual basis that Childhood Leukemia Foundation's books and records present Childhood Leukemia Foundation's financial position in a fair manner in accordance with accounting principles generally accepted in the United States.

10. As set forth in more detail below, Childhood Leukemia Foundation seeks (i) declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, that the investigation of Childhood Leukemia Foundation is unlawful and unauthorized by Congress, that the CID issued to Childhood Leukemia Foundation is unlawful and unauthorized by Congress, that Childhood Leukemia Foundation's Due Process and Equal Protection rights are being violated by the investigation, and that the unlawful CID is void because it was issued by Commissioners whose insulation from removal at will by the President violates the principle of separation of powers, and (ii) injunctive relief setting aside as void the unlawful investigation and/or CID of Childhood Leukemia Foundation as necessary and/or proper pursuant to 28 U.S.C. § 2202.

## II.    VENUE AND JURISDICTION

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

BE:13256950.1/BEO001-107020

12.     This Court has personal jurisdiction over the FTC, a federal government agency, and its Commissioners that are conducting an ongoing investigation of Childhood Leukemia Foundation whose offices are in this State and District.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because the FTC is an agency of the United States government and because the Plaintiff regularly transacts business in this District.

### III.     THE PLAINTIFF – CHILDHOOD LEUKEMIA FOUNDATION

14.     The Plaintiff, Childhood Leukemia Foundation, was incorporated as a non-stock corporation in 1992 in New Jersey.  Its principal office is located in Brick, New Jersey.

15.     Childhood Leukemia Foundation was created for the purpose of alleviating the pain and suffering of children afflicted with leukemia.  Childhood Leukemia Foundation seeks to educate, empower, and lift the spirits of children – ages newborn to 21 – that have been diagnosed with childhood cancer.

16.     One recent example of how Childhood Leukemia Foundation has acted to support its educational mission was Childhood Leukemia Foundation's funding of the video titled, Understanding Acute Myeloid Leukemia in Children and Adolescents, which is hosted on the following website:  https://www.youandpediatricaml.com/en-paml/home.  Childhood Leukemia Foundation paid Mechanisms in Medicine $48,000.00 to create and produce the video in 2021.

17.     Day to day, Childhood Leukemia Foundation carries out its mission by and through several established programs: "Keeping Kids Connected," "Hope Binders," "Hugs U Wear," "Wish Baskets," and "Hospital Visits and Special Requests."

18.     The "Keeping Kids Connected" program has provided thousands of iPads to children and hospitals to help young cancer patients remain connected to family, friends, and

BE:13256950.1/BEO001-107020

school while receiving treatment.  The iPads keep the children productive and current with schoolwork during their treatments.  They also provide children with entertainment and distractions during painful or uncomfortable procedures.

19.     The "Hope Binders" program provides children and their families with an organizational tool to help keep track of their medical treatments and costs associated with patient care, which can be an otherwise overwhelming amount of information to track.

20.     The "Educational Wish Baskets" program delivers cheerful surprises to hospitalized children.  Each basket is focused on STEAM-inspired principles (science, technology, engineering, arts, and mathematics) and contains many gift items to help improve and maintain necessary skill sets needed for continued development.  Every item challenges, engages, comforts, and offers recreation during and after the children's lengthy hospital stays associated with cancer treatment.

21.     The "Hugs U Wear" program has provided custom-made, 100% human hair wigs to children suffering from a loss of self-esteem due to treatment-induced hair loss.

22.     The "Hospital Visits and Special Requests" program provides a personal touch to help make a child's day just a little happier.  Through this program, Childhood Leukemia Foundation provides hospital pizza parties, ice cream socials, and other fun events that take place in pediatric cancer wards to help brighten the children's days.  In fact, as recently as May 2023, Childhood Leukemia Foundation assisted a family with a child fighting leukemia by taking that child to Walt Disney World so that they could bring some happiness to the child during his cancer battle.  Through this program, Childhood Leukemia Foundation paid for the family's meals and plane tickets.

BE:13256950.1/BEO001-107020

23.     Childhood Leukemia Foundation has always made a concerted effort to ensure that no child's request for a program service is unfulfilled.  It provides all programs to sick children and their families at absolutely no cost to them.

24.     Childhood Leukemia Foundation generates all of its revenue through its fundraising activities.  These activities can take a variety of forms, such as direct public support, automobile and clothing donations, grants, and an annual gift auction.

25.     Childhood Leukemia Foundation is managed on a day-to-day basis by an Executive Director under the supervision of a volunteer board of directors that meets quarterly and operates with three full-time staff members.  Upon information and belief, the Executive Director earns significantly less than the market salary for an Executive Director at a non-profit in the vicinity.

## IV.     THE FEDERAL TRADE COMMISSION'S UNAUTHORIZED INVESTIGATION INTO CHILDHOOD LEUKEMIA FOUNDATION, A CORPORATION NOT ORGANIZED FOR ITS OWN PROFIT

26.     The FTC's investigative authority is limited to gathering and compiling "information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any person, partnership, or *corporation* engaged in or whose business affects commerce[.]" 15 U.S.C. § 46(a) (emphasis added).  Furthermore, pursuant to 15 U.S.C. § 57b-1(b), any investigation pursuant to Section 46(a) shall be conducted in accordance with the following procedures:

> Whenever the Commission has *reason to believe* that any *person* may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 5(a)(1) [15 USCS § 45(a)(1)]), or to antitrust violations, the Commission may, before the institution of any proceedings under this Act, issue in writing, and cause to be served upon such *person*, a civil investigative demand requiring such *person* to produce such documentary material for inspection and copying or reproduction, to submit such

6

tangible things, to file written reports or answers to questions, to give oral testimony concerning documentary material or other information, or to furnish any combination of such material, answers, or testimony.

15 U.S.C. 57b-1(c) (emphasis added).

27.    Importantly, Congress did not extend the FTC's investigative authority in 15 U.S.C. § 46(a) to companies like Childhood Leukemia Foundation, i.e., without shares of capital or capital stock or certificates of interest that are not organized to carry on business for their own profit.  Non-stock, non-member and not-for-profit entities like Childhood Leukemia Foundation are carved out from the definition of "*corporation*" in the FTC Act, 15 U.S.C. § 44.

28.    Moreover, the CID procedures laid out in Section 57b-1(c) allow CIDs to be issued only to "*person*[s]," a defined term.  Specifically, "[t]he term 'person' means any natural person, partnership, *corporation*, association, or other legal entity, including any person acting under color or authority of State law."  15 U.S.C. § 57b-1(a)(6) (emphasis added).  As previously stated, the FTC Act carves out non-profits from the definition of "corporation."  15 U.S.C. § 44 ("'Corporation' shall be deemed to include any company, trust, so-called Massachusetts trust, or association, incorporated or unincorporated, which is organized to carry on business for its own profit or that of its members, and has shares of capital or capital stock or certificates of interest, and any company, trust, so-called Massachusetts trust, or association, incorporated or unincorporated, without shares of capital or capital stock or certificates of interest, except partnerships, which is organized to carry on business for its own profit or that of its members.").

29.    Thus, when the FTC issued a CID to Childhood Leukemia Foundation on August 15, 2022, it did so without authority in two respects:

    a.    The FTC lacked authority to focus on Childhood Leukemia Foundation as the object of its investigation under 15 U.S.C. 46(a) (since not-for-profits

BE:13256950.1/BEO001-107020

like Childhood Leukemia Foundation are not "corporations" under the FTC Act); and

b.    The FTC lacked authority to issue the CID to Childhood Leukemia Foundation under 15 U.S.C. 57b-1(c) because a plain reading of the statute requires the conclusion that "person" does not include not-for-profits. Any other reading would read the defined term "corporation" out of the definition of "person" in Section 57b-1(a)(6).

30.    Also importantly, the FTC lacks enforcement authority against not-for-profits like Childhood Leukemia Foundation, including lacking authority to seek monetary remedies against them.  Specifically, 15 U.S.C. § 57b extends enforcement authority against only a "person, partnership, or *corporation*," which as explained above does not include not-for-profits like Childhood Leukemia Foundation.

31.    Despite all the foregoing limitations against investigating (and ultimately bringing enforcement actions against) not-for-profits, the FTC nevertheless made Childhood Leukemia Foundation its object of investigation, claiming the following as the purpose of the CID:

> Our purpose is to determine *whether Childhood Leukemia Foundation, Inc.* . . . *committed violations* of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) and/or committed violations of the Commission's Telemarketing Sales Rule, 16 C.F.R. Part 310, relating to the solicitation of charitable donations, and whether Commission action to obtain monetary relief would be in the public interest.

A true, accurate copy of the FTC's CID to Childhood Leukemia Foundation is attached hereto as **Exhibit A** (emphasis added).

32.    The CID issued to Childhood Leukemia Foundation was issued pursuant to the FTC's vague "RESOLUTION DIRECTING USE OF COMPULSORY PROCESS IN A NON-PUBLIC INVESTIGATION OF DECEPTIVE FUNDRAISING" which discloses the "nature and scope of investigation" as "[t]o determine whether unnamed persons, partnerships,

*corporations*, or others in connection with soliciting charitable contributions, donations, or gifts of money, or any other thing of value," have violated Section 5 of the FTC Act.  *See* final page of Ex. A, CID, attaching the Resolution (emphasis added).   "The investigation is also to determine whether Commission action to obtain equitable monetary relief for injury to consumers or others would be in the public interest."  *Id.*

33.     Nowhere in the FTC Act has Congress authorized the Commission to engage in fishing expeditions and burden an audited, registered, non-stock, non-member, not-for-profit charity in order to parse together a case of jurisdiction against an entity it would not have jurisdiction to seek monetary relief from otherwise.  The FTC Act expressly does the opposite – excepting Childhood Leukemia Foundation from being a permissible object of the Commission's investigation as well as excepting it from receiving CIDs at all.

34.     After receipt of the CID, Childhood Leukemia Foundation filed a Petition to Quash the CID on September 9, 2022, rightfully asserting that the FTC lacked the authority to investigate Childhood Leukemia Foundation and to issue the CID to Childhood Leukemia Foundation.  To support its assertion that Childhood Leukemia Foundation is a non-stock, non-member, not-for-profit, the Petition to Quash included a declaration from Childhood Leukemia Foundation's Executive Director with hundreds of pages of documents attached.

35.     The FTC's Order Denying Childhood Leukemia Foundation's Petition to Quash ("Order") removes any doubt that Childhood Leukemia Foundation is the "object" of the FTC's investigation, and therefore the FTC does not have authority to investigate.  *See* Order, attached hereto as **Exhibit B**, at 2 ("The [FTC] is conducting an investigation to determine whether CLF is engaged in 'unfair or deceptive acts or practices' in violation of Section 5 of the FTC Act, 15 U.S.C. § 45.").

9

36.     As a failsafe, the FTC relies on its outdated, untenable position, contradicted by the plain authorizing language of the FTC Act, that it must be able to investigate Childhood Leukemia Foundation in order to "determine whether CLF is truly operated as a nonprofit." Ex. B, Order at p. 4.   Such a claim runs afoul of the requirement in Section 57b-1(c) that the Commission must have "reason to believe" first and foremost that a "person," as defined, has relevant documentation.   *The FTC cannot issue a CID to Childhood Leukemia Foundation without first having reason to believe that Childhood Leukemia Foundation is a non-stock corporation operating **for profit*** (contrary to their status with the IRS and opinion of independent auditors).   But, as the Commission admits in its Order, it did not have a basis for such belief when it issued the CID.   Rather, the CID is, for the FTC, a tool to unlawfully put the charity under a microscope and concoct a claim of jurisdiction over it.   *See* Ex. B, Order at 2 (stating that the CID "seeks information about CLF's governance and operations, which is relevant to the [FTC]'s determination as to whether CLF qualifies as a 'corporation' within the meaning of Section 4 of the FTC Act").

37.     The FTC's justification, unmoored from any statute, is unconstitutional and ripe for abuse.   The effects of this have been keenly felt by Childhood Leukemia Foundation for the past nine months.   Not only did the Commissioner issue the unlawful CID, but it has operated as prosecutor by building the FTC's purported case of jurisdiction over Childhood Leukemia Foundation.   The Commission has also operated as judge by (unsurprisingly) denying the Petition to Quash to allow itself the opportunity to build its case and eventually litigating Childhood Leukemia Foundation into the ground.   All this without leaving Childhood Leukemia Foundation with any path for independent judicial review of the dispute over the FTC's

10

jurisdiction at the outset before being subject to further harm by the FTC's self-serving claim to a right to investigate its own jurisdiction.

38.     Indeed, it turns out that the FTC's CID to Childhood Leukemia Foundation is an outrageous fishing expedition that cannot be satisfied.  As part of Childhood Leukemia Foundation's Motion to Quash, it produced approximately 235 pages of documents to the FTC. After the FTC denied Childhood Leukemia Foundation's Motion to Quash, Childhood Leukemia Foundation produced an additional 3,169 pages of documents to the FTC, including all the IRS Form 990s and independent audits.  It did so hoping to assure the Commission that Childhood Leukemia Foundation is not operating for its own profit.  Despite Childhood Leukemia Foundation's cooperation and voluminous document production, the FTC continues to press Childhood Leukemia Foundation for more information and threaten it with enforcement actions by virtue of what the FTC perceives as deficiencies in Childhood Leukemia Foundation's original response/production and numerous supplemental productions.

39.     The CID is no one-hit subpoena duces tecum.  Childhood Leukemia Foundation has incurred over $100,000 in attorneys' fees to date in asserting its rights as well as attempting to comply with the CID.  This is a significant sum of money that would otherwise directly benefit children dying of cancer.  If the stigma of an FTC investigation attaches to Childhood Leukemia Foundation, if it hasn't already, there will be an immeasurable negative impact on its grant applications and donor relationships, regardless of the investigation's unconstitutionality and baselessness.

BE:13256950.1/BEO001-107020

## COUNT I

**(The Investigation Focusing on Childhood Leukemia Foundation Is Unlawful Because It Was Not Authorized by Congress.)**

40.     Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

41.     Childhood Leukemia Foundation is a non-stock corporation without members and is not organized for its own profit.

42.     Accordingly, the investigation focusing on Childhood Leukemia Foundation under 15 U.S.C. § 46(a) is not authorized by Congress because Childhood Leukemia Foundation is expressly excepted from the FTC's investigative authority in Section 46(a).

43.     As set forth above, Childhood Leukemia Foundation has suffered significant harm as a result.  No money damages can remedy this harm, and Childhood Leukemia Foundation has no legal avenue by which to recover any money damages against the Commission.

## COUNT II

**(The CID Issued to Childhood Leukemia Foundation Is Unlawful Because It Was Not Authorized by Congress.)**

44.     Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

45.     Childhood Leukemia Foundation is a non-stock corporation without members and is not organized for its own profit.

46.     Accordingly, the CID issued to Childhood Leukemia Foundation was not authorized by Congress because (i) construction of 15 U.S.C. § 57b-1(c) mandates the conclusion that the term "person" does not include non-stock, non-member, not-for-profit corporations and therefore the CID could not be issued to Childhood Leukemia Foundation, and

12

(ii) the FTC did not have "reason to believe" that Childhood Leukemia Foundation was a "person" as used in 15 U.S.C. § 57b-1(c), i.e., organized for its own profit or that of its non-existent members.

47.     As set forth above, Childhood Leukemia Foundation has suffered significant harm as a result.  No money damages can remedy this harm, and Childhood Leukemia Foundation has no legal avenue by which to recover any money damages against the Commission.

## COUNT III

### (The Investigation, Inclusive of the Commission's Denial of Childhood Leukemia Foundation's Petition to Quash, Violates Childhood Leukemia Foundation's Fifth Amendment Rights.)

48.     Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

49.     The ongoing investigation in which the FTC acts as prosecutor, judge, and jury, violates Childhood Leukemia Foundation's Due Process rights, including but not limited to depriving Childhood Leukemia Foundation of the ability to make its case that the Commission lacks jurisdiction and authority to investigate Childhood Leukemia Foundation and issue a CID to it before a neutral arbiter at the outset before being subjected to significant harm.

50.     By presenting Childhood Leukemia Foundation's Petition to Quash the CID to the very tribunal, the Commission itself, that issued the CID subjects Childhood Leukemia Foundation to unfair procedures before a biased administrative body, rather than to a fair trial before a neutral judge appointed in accordance with Article III of the Constitution with the procedural protections of a federal court, and therefore violates Childhood Leukemia Foundation's Equal Protection rights.

BE:13256950.1/BEO001-107020

51.     The Commission's conduct has caused and will continue to cause Childhood Leukemia Foundation to suffer immediate and irreparable harm to its Constitutional rights to Due Process and Equal Protection.

52.     No money damages can remedy this harm, and Childhood Leukemia Foundation has no legal avenue by which to recover any money damages against the Commission. Moreover, the FTC's investigation is not speculative. It is ongoing and will continue if left unchecked.

**COUNT IV**

**(The FTC's Structure Violates Article II and Therefore the Unlawful CID Issued by the Commissioner Is Void.)**

53.     Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

54.     The FTC's actions separately violate Childhood Leukemia Foundation's Constitutional rights because the agency's structure, on its face, is unconstitutional under Article II.  In particular, Article II requires that Executive officials exercising law-enforcement power be removable at will by the President.

55.     Congress initially established the FTC as an independent agency "composed of five commissioners who shall be appointed by the President with the advice and consent of the Senate."  Each Commissioner is appointed for a seven-year term.

56.     Although the FTC today, as opposed to its early days, clearly exercises executive power—including but not limited to the investigation and subsequent enforcement of laws—its Commissioners are shielded from at-will removal.

BE:13256950.1/BEO001-107020

57.     The Commissioners are removable only "for inefficiency, neglect of duty, or malfeasance in office."   In short, Congress limited the President's ability to remove Commissioners to reasons only *for cause*.

58.     This limitation on the President's power to remove Commissioners conflicts with the Constitution's grant of all executive power to the President as he or she is solely responsible for ensuring that the laws of the United States are faithfully executed.

59.     Because the agency's structure violates Article II, the unlawful investigation and CID issued by the Commission under its present structure are invalid.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter an order providing Plaintiff with (i) declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, that the investigation of Childhood Leukemia Foundation is unlawful and unauthorized by Congress, that the CID issued to Childhood Leukemia Foundation is unlawful and unauthorized by Congress, that Childhood Leukemia Foundation's Due Process and Equal Protection rights are being violated by the investigation, and that the unlawful CID is void because it was issued by Commissioners whose insulation from removal at will by the President violates the separation of powers, and (ii) injunctive relief setting aside as void the unlawful investigation and/or CID of Childhood Leukemia Foundation as necessary and/or proper pursuant to 28 U.S.C. § 2202.

Dated:  June 2, 2023

/s/  *Bob Kasolas*
Bob Kasolas, Esq.
Mark E. Critchley, Esq.
Brach Eichler, LLC
101 Eisenhower Parkway
Roseland, NJ 07068
T: 973-403-3139; F: 973-618-5539
bkasolas@bracheichler.com
mcritchley@bracheichler.com
*Counsel for Plaintiff*

BE:13256950.1/BEO001-107020

## <u>CERTIFICATION PURSUANT TO LOCAL CIV. R. 11.2</u>

The within matter in controversy is not related to any other pending litigation in state or federal court.  I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I may be subject to punishment.

**BRACH EICHLER LLC**
Attorneys for Plaintiff

By:     */s/ Bob Kasolas*
         BOB KASOLAS, ESQ.

DATED: June 2, 2023

BE:13256950.1/BEO001-107020

# **<u>EXHIBIT A</u>**



**EXHIBIT A**



Office of the Secretary

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

August 11, 2022

Via FedEx
Childhood Leukemia Foundation, Inc.
Attn: Barbara Haramis, Executive Director
807 Montoloking Rd., Suite 202
Brick, NJ 08723
732.998.1431

FTC Matter No. 2223073

Dear Childhood Leukemia Foundation, Inc.:

The Federal Trade Commission ("FTC") has issued the attached Civil Investigative Demand ("CID") asking for information as part of a non-public investigation. Our purpose is to determine whether Childhood Leukemia Foundation, Inc., as defined in the enclosed CID schedule, committed violations of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) and/or committed violations of the Commission's Telemarketing Sales Rule, 16 C.F.R. Part 310, relating to the solicitation of charitable donations, and whether Commission action to obtain monetary relief would be in the public interest.  Please read the attached documents carefully.  Here are a few important points we would like to highlight:

1.   **Contact FTC counsel, M. Elizabeth Howe (206.220.4476; mhowe@ftc.gov) or Tracy Thorleifson (206.220.4481, tthorliefson@ftc.gov), as soon as possible to schedule a telephone call to be held within 14 days.** During that telephone call, FTC counsel can address any questions or concerns you have regarding this CID, including whether there are changes to how you comply with the CID that would reduce your cost or burden while still giving the FTC the information it needs.  Please read the attached documents for more information about that meeting.

2.   **You must immediately stop any routine procedures for electronic or paper document destruction, and you must preserve all paper or electronic documents** that are in any way relevant to this investigation, even if you believe the documents are protected from discovery by privilege or some other reason.

3.   **The FTC will use information you provide in response to the CID for the purpose of investigating violations of the laws the FTC enforces.**  We will not

disclose the information under the Freedom of Information Act, 5 U.S.C. § 552. We may disclose the information in response to a valid request from Congress, or to other civil or criminal law enforcement agencies for their official law enforcement purposes. The FTC or other agencies may use and disclose your response in any civil or criminal proceeding, or if required to do so by law. However, we will not publicly disclose your information without giving you prior notice.

4. **Please read the attached documents closely.** They contain important information about how you should provide your response.

Please contact FTC counsel as soon as possible to set up an initial meeting. We appreciate your cooperation.

Very truly yours,

April J. Tabor
Secretary

United States of America
Federal Trade Commission

## *CIVIL INVESTIGATIVE DEMAND*

| 1. TO | | 1a. MATTER NUMBER |
|---|---|---|
| Childhood Leukemia Foundation, Inc.<br>Attn: Barbara Haramis, Executive Director<br>807 Montoloking Rd., Suite 202<br>Brick, NJ 08723 | ▼ | 2223073 |

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

2. ACTION REQUIRED

☐ You are required to appear and testify.

| LOCATION OF HEARING | YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| | |
| | DATE AND TIME OF HEARING OR DEPOSITION |

☒ You are required to produce all documents described in the attached schedule that are in your possession, custody, or control, and to make them available at your address indicated above for inspection and copying or reproduction at the date and time specified below.

☒ You are required to answer the interrogatories or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 4 on or before the date specified below.

☐ You are required to produce the tangible things described on the attached schedule. Produce such things to the Records Custodian named in Item 4 on or before the date specified below.

DATE AND TIME THE DOCUMENTS, ANSWERS TO INTERROGATORIES, REPORTS, AND/OR TANGIBLE THINGS MUST BE AVAILABLE

September 12, 2022 by 5:00 pm ET

3. SUBJECT OF INVESTIGATION

See attached Schedule and attached resolution.

| 4. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 5. COMMISSION COUNSEL |
|---|---|
| Lourdes Fuentes, Investigator/ Eric M. Setala, Investigator (Deputy)<br>Federal Trade Commission<br>915 2nd Ave., Suite 2896<br>Seattle, WA 98174<br>(206) 220-6350 | M. Elizabeth Howe/ Tracy S. Thorleifson<br>Federal Trade Commission<br>915 2nd Ave., Suite 2896<br>Seattle, WA 98174<br>(206) 220-6350 |

| DATE ISSUED | COMMISSIONER'S SIGNATURE |
|---|---|
| 8/11/2022 | |

### INSTRUCTIONS AND NOTICES

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The production of documents or the submission of answers and report in response to this demand must be made under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances of such production or responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

### PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

### YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

### TRAVEL EXPENSES

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this demand should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this demand and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

A copy of the Commission's Rules of Practice is available online at http://bit.ly/FTCSRulesofPractice. Paper copies are available upon request.

# Form of Certificate of Compliance*

I/We do certify that all of the documents, information and tangible things required by the attached Civil Investigative Demand which are in the possession, custody, control, or knowledge of the person to whom the demand is directed have been submitted to a custodian named herein.

If a document or tangible thing responsive to this Civil Investigative Demand has not been submitted, the objections to its submission and the reasons for the objection have been stated.

If an interrogatory or a portion of the request has not been fully answered or a portion of the report has not been completed, the objections to its submission and the reasons for the objections have been stated.

Signature _____

Title _____

Sworn to before me this day

_____    _____

_____
Notary Public

_____

*In the event that more than one person is responsible for complying with this demand, the certificate shall identify the documents for which each certifying individual was responsible.  In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

# FEDERAL TRADE COMMISSION ("FTC")
# CIVIL INVESTIGATIVE DEMAND ("CID") SCHEDULE
### FTC File No. 2223073

**Meet and Confer:** You must contact **FTC counsel, M. Elizabeth Howe (206.220.4476; mhowe@ftc.gov) or Tracy Thorleifson (206.220.4481, tthorliefson@ftc.gov)**, as soon as possible to schedule a telephonic meeting to be held within fourteen (14) days after You receive this CID. At the meeting, You must discuss with FTC counsel any questions You have regarding this CID or any possible CID modifications that could reduce Your cost, burden, or response time yet still provide the FTC with the information it needs to pursue its investigation. The meeting also will address how to assert any claims of protected status (e.g., privilege, work-product, etc.) and the production of Electronically Stored Information. You must make available at the meeting personnel knowledgeable about Your information or records management systems, Your systems for Electronically Stored Information, custodians likely to have information responsive to this CID, and any other issues relevant to compliance with this CID.

**Document Retention:** You must retain all documentary materials used in preparing responses to this CID. The FTC may require the submission of additional Documents later during this investigation. **Accordingly, You must suspend any routine procedures for Document destruction and take other measures to prevent the destruction of Documents in Your possession, custody, or control** that are in any way relevant to this investigation, even if those Documents are being retained by a third-party or You believe those Documents are protected from discovery. *See* 15 U.S.C. § 50; *see also* 18 U.S.C. §§ 1505, 1519.

**Sharing of Information:** The FTC will use information You provide in response to the CID for the purpose of investigating violations of the laws the FTC enforces. We will not disclose such information under the Freedom of Information Act, 5 U.S.C. § 552. We also will not disclose such information, except as allowed under the FTC Act (15 U.S.C. § 57b-2), the Commission's Rules of Practice (16 C.F.R. §§ 4.10 & 4.11), or if required by a legal obligation. Under the FTC Act, we may provide Your information in response to a request from Congress or a proper request from another law enforcement agency. However, we will not publicly disclose such information without giving You prior notice.

**Manner of Production:** Contact **Lourdes Fuentes (206.220.6357; lfuentes@ftc.gov)** by email or telephone at least five days before the return date for instructions on how to produce information responsive to this CID.

**Certification of Compliance:** You or any person with knowledge of the facts and circumstances relating to the responses to this CID must certify that such responses are complete by signing the "Certification of Compliance" attached to this CID.

**Certification of Records of Regularly Conducted Activity:** Attached is a Certification of Records of Regularly Conducted Activity. Please execute and return this Certification with Your response. Completing this certification may reduce the need to subpoena You to testify at future proceedings to establish the admissibility of Documents produced in response to this CID.

**Definitions and Instructions**: Please review carefully the Definitions and Instructions that appear after the Specifications and provide important information regarding compliance with this CID.

## I.    SUBJECT OF INVESTIGATION

Whether the Company, as defined herein, committed violations of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) and/or committed violations of the Commission's Telemarketing Sales Rule, 16 C.F.R. Part 310, relating to the solicitation of charitable donations, and whether Commission action to obtain monetary relief would be in the public interest.  See also attached resolution.

## II.    SPECIFICATIONS

**Applicable Time Period:**  Unless otherwise directed, the applicable time period for the requests set forth below is from **January 1, 2019 until the date of full and complete compliance with this CID.**

## A.    INTERROGATORIES

Please provide the following information:

### Background

1.      For all periods that the Company has been in operation, state the correct legal name of the Company and all other assumed names under which the Company does or has done business and the time period(s) during which each assumed name has been in use.

2.      For all periods that the Company has been in operation, identify the service name, URL, and server (i.e. IP address) of each website, social media account, or other electronic or digital interface owned or used by the Company to communicate with Donors, to make representations about its program services, or to solicit or accept Charitable Contributions; and, for each, provide the associated Digital Communications Identifiers used by the Company in connection with such communications and services, including any personal email or other accounts used to communicate with Donors.

3.      Identify each Person answering these Interrogatories, supplying information, or assisting in any way with the preparation of the answers to these Interrogatories.

### Board of Directors

4.      Describe the Company's policies and practices for recruiting, approving, and training new members of the board of directors.

5.      Describe the means by which the board of directors evaluates the performance of the Chief Executive Officer, Executive Director, and any other officer or Employee whose Compensation is set or approved by, or performance appraised by, the board of directors or a

committee thereof, including when such evaluation is conducted, and Identify all individuals who participate in such evaluation.

6.   State the date and location of each board meeting, board committee meeting, and board retreat and Identify the individuals present.

## Company Finances and Oversight

7.   State the location, account number, and Person(s) with current or former signatory authority for each checking, depository, savings, investment, credit card, debit card, charge card, loan, cryptocurrency, or other financial account in any bank, credit union, or other institution or service (including person-to-person (P2P) electronic funds transfer accounts (e.g., PayPal, Venmo, CashApp)) currently or formerly held in the name of the Company or otherwise holding funds on behalf of the Company.

8.   Describe the Company's policies and practices regarding oversight, monitoring, or other auditing of any account in any bank, credit union, or other institution or service (including person-to-person (P2P) electronic funds transfer accounts (e.g. PayPal, Venmo, CashApp)) held in the name of or on behalf of the Company, or into which Charitable Contributions made to the Company have been deposited, and Identify the Person(s) responsible for any such oversight, monitoring, or audit(s). Include in your description the date(s) any such policies were implemented and updated, and Identify the Persons responsible for approving such implementation and updating.

9.   Describe the Company's policies and practices regarding issuance and use of Company debit and credit cards, assignment and use of Company vehicles, and payment or reimbursement of travel and entertainment expenses, specifically including any steps taken by the Company to oversee, monitor, or audit such cards, vehicles, and expenses; how such cards, vehicles, and expenses furthered the mission of the Company; and the Person(s) responsible for any such oversight, monitoring, or audit. Include in your description the date(s) any such policies were implemented and updated and Identify the Persons responsible for approving such implementation and updating.

10.   Identify any officer, Employee, or board member of the Company, and any first degree relative of the preceding (spouse, parent, sibling, or child, or his/her spouse), to whom the Company has made a loan, and state the date of the loan, the amount and terms of repayment, and whether the loan was repaid pursuant to those terms or otherwise.

11.   Identify each Person other than an Employee or a program service recipient to whom the Company has provided any benefit valued at more than $100, or been reimbursed in excess of $100 for expenses, and describe the benefit(s) provided or the expenses for which reimbursement was paid.

12.   State whether the Company has or has had an annual budget approved by the board and describe how that budget is developed and followed.

13.    Describe the Company's policies and practices for receipt, inventory management, disbursement of, and accounting for cryptocurrency, stock, Gift(s)-in-Kind, or other goods received or purchased by the Company for disbursement.

### Employees

14.    Identify all Employees currently Employed by the Company.  For each such Person, specify the office location in which that Person works; provide the full name, any alias used, employment address, employment telephone number, and employment e-mail addresses, and state the period of time during which the Person has been Employed by the Company, all positions held with the Company, and the amounts and manner by which the Person has been compensated (including benefits).

15.    For the last ten fiscal years of the Company's operation, Identify all Persons who were previously Employed by the Company.  Identify each such Person by full name, any alias used, the present or last-known residence and place of business, physical and email addresses, and present or last-known residence and business telephone numbers, and state the period of time during which the Person was Employed by the Company, the position(s) held with the company, the amounts and manner by which the Person was compensated (including benefits), and the reason that the Person no longer works for the Company.

16.    Describe the Company's policies and practices related to determining the employment terms and conditions and total Compensation package paid to each Employee by the Company and Identify the Person(s) responsible for making those determinations.

### Fundraising

17.    Identify each Fundraiser or other Person that has solicited Charitable Contributions on behalf of the Company, including each assumed name under which Charitable Contributions have been solicited, and for each such Fundraiser state:

a.    the date(s) during which such solicitations occurred;
b.    the nature of the solicitation (i.e., telemarketing, direct mail, email, in-person, etc.);
c.    the total funds raised by that entity for the Company, by year, by U.S. state or territory, and by assumed name under which Charitable Contributions were solicited;
d.    the net funds retained by the Company as a result of that fundraising, by year, by U.S. state or territory, and by assumed name under which Charitable Contributions were solicited;
e.    the total amount paid by the Company to that Fundraiser or other Person and how that amount was calculated; and
f.    the total amount paid by the Company to any other Person or entity (i.e., any consultant, list company, mailing house, caging operation, payment processor, etc.) in connection with soliciting Charitable Contributions and how that amount was calculated.

- 4 -

18.    Identify each Person or entity that has provided the Company with services in connection with fundraising, including the nature of the services provided, the dates during which such services were provided, and the name of the Person at the Company who primarily communicated with that Person or entity, specifically including the Identity of any (a) consultant; (b) "caging operation" or other entity to collect or process Charitable Contributions including but not limited to escrow agent(s); (c) list management company; (d) direct mail house; or (e) payment processor.

19.    Identify each Person at the Company responsible for creating, reviewing, or approving solicitation materials, including telemarketing scripts; direct mail solicitations; pledge fulfillment, thank you or Charitable Contribution receipt mailings; email solicitations; short message service (SMS) or text messages; and online or other digital or electronic materials.

20.    Describe the Company's policies and practices with regard to ensuring that each Fundraiser that has solicited Charitable Contributions on behalf of the Company by telephone complies with the relevant provisions of the Telemarketing Sales Rule, 16 C.F.R. Part 310, including but not limited to Do-Not-Call provisions and provisions related to the use of pre-recorded messages, and Identify the Persons responsible for ensuring such compliance.

21.    Describe the Company's policies and procedures related to the sale, rental, or exchange of any list of Donor names and contact information to third parties for uses unrelated to solicitations on behalf of the Company.

22.    Identify each Person or entity to which the Company has sold, rented, or otherwise provided any list(s) of Donors and describe the purpose for which the list was used, the nature of the exchange, and any revenue or other benefit received for use of the list.

## Program Services

**Note: Do not respond with any sensitive personally identifiable information ("Sensitive PII") or sensitive health information ("SHI"),** *see* **Instruction I-11 below, prior to discussing the information with FTC counsel. If you believe a particular Interrogatory calls for a response containing Sensitive PII or SHI, contact FTC counsel to confer regarding the Interrogatory prior to responding.**

23.    For each of the following Company programs, "Hope Binders," "Educational Wish Baskets," "Hugs U Wear," and "Hospital Visits and Special Requests," state, by year and by U.S. state or territory:

    a.    the number of individual cancer patients or families of individual cancer patients who received each item or each visit provided by the program;

    b.    the number of hospitals, nonprofit organizations, or other entities that received each item or each visit provided by the program and how many program items or program visits were proved to each such entity; and

    c.    the Identity of any hospital, nonprofit, or other entity that has received each program item or each program visit from the Company or from third parties on behalf of the Company.

- 5 -

**Do not provide the identity, PII, or SHI of any individual (i.e. non-entity) recipient.**

24.     Separately describe the Company's "Hope Binders," "Educational Wish Baskets," "Hugs U Wear," and "Hospital Visits and Special Requests" programs, including describing for each:

a.    the materials that make up and/or are included in the program;

b.    how the Company procures the materials that make up and/or are included in the program;

c.    the dollar value of each item provided by the program;

d.    the cost to the Company of each program item or program visit;

e.    how the Company assembles and ships program items and identifies and schedules program visits;

f.    how the Company publicizes the availability of programs; and

g.    how the Company selects program recipients, including the Identity of each Person involved in the selection process.

25.     For the provision of any goods or program services not identified in response to Interrogatory Nos. 23 and 24, above, state, by year and by U.S. state or territory:

a.    the number of individual cancer patients or families of individual cancer patients who benefited from those goods or program services;

b.    the number of hospitals, nonprofit organizations or other entities that benefited from those goods or program services;

c.    the Identity of any hospital, nonprofit organization, or other entity that benefited from those goods or program services; and

d.    the nature of the goods or program service provided, the dollar value of the goods or program service (including specifically the value of any goods provided), and the cost to the Company of providing the goods or program service (including the actual cost to the Company of any goods provided).
**Do not provide the Identity, PII, or SHI of any individual (i.e. non-entity) recipient.**

26.     For the provision of any goods or program services not identified in response to Interrogatory Nos. 23 and 24, above, describe the goods or program services, including:

a.    how the Company procures any goods and/or facilitates any services provided as part of these other goods or program services;

b.    the Identity of all Persons or entities involved in providing the goods, services, and/or other benefits and a description of what goods, services, and/or other benefits these persons or entities provided;

c.    how the Company publicizes the availability of the goods or program services; and

d.    how the Company selects recipients of the goods or program services, including the Identity of each Person involved in the selection process.

<b><u>Litigation and Governmental Regulation</u></b>

27.      For each proceeding (including investigations, subpoenas, civil investigative demands, other formal or informal requests for information, inquiries, actions, and arbitrations) with any governmental entity, to which the Company or any officer or director of the Company was a subject or party:

      a.    Identify the parties and their counsel;

      b.    state the date each proceeding commenced and ended (provide estimates if exact dates are unknown); and

      c.    state how the proceeding was resolved, if it is not pending.

28.      List every lawsuit filed against the Company, and for each suit, state:

      a.    the parties;

      b.    case number and court where filed;

      c.    date filed and date of disposition;

      d.    the Identity of any Company Employee, officer, or director who was deposed in connection with the lawsuit; and

      e.    any final disposition.

**B.      REQUESTS FOR PRODUCTION**

Please produce the following Documents: (including Documents that consist of Electronically Stored Information, see Instruction I-10):

<b><u>Background</u></b>

1.      Documents sufficient to reflect the formation of the Company, including its articles of incorporation and bylaws, as well as any amendments thereto, even if such documents were created prior to the Applicable Time Period.

2.      All Documents related to establishing and maintaining the tax-exempt status of the Company, including the IRS Form 1023, any supplemental documents filed with the Internal Revenue Service, and communications between the Company or its representatives and the IRS relating to obtaining or maintaining its tax-exempt status, even if such documents were created prior to the Applicable Time Period.

3.      Documents sufficient to show the Company's record retention policies.

4.      Documents sufficient to show the Company's conflict of interest policies.

<b><u>Board of Directors</u></b>

5.      For all periods that the Company has been in operation, documents sufficient to Identify each current and former member of the board of directors of the Company, whether the

- 7 -

individual is or was a voting or non-voting member, the date(s) of the individual's service and any offices held, and whether that individual has or had any marital, familial, or professional relationship to any other board member(s) or director(s).

6.      Documents sufficient to Identify each committee appointed by the board of directors, and the past and present members of each such committee, including both standing and ad hoc committees.

7.      Documents sufficient to Identify any corporation or other entity with which the Company has done business that Employs or is owned, in whole or in part, by a member of the board of directors or a first degree relative of a member of the board of directors (spouse, parent, sibling, or child of the board member or his/her spouse).

8.      All Documents prepared by or on behalf of, or provided to, the board of directors of the Company, specifically including but not limited to:

    a.    Documents related to each board meeting, including minutes, agendas, attachments, reports, handouts, presentations, periodic budget, profit and loss statement, balance sheet, or other financial reporting Document, and any other Document reflecting information considered by the board at or in connection with each such meeting;

    b.    Documents related to each committee established by or reporting to the board of directors and any documents related to meeting(s) of each such committee, including minutes, agendas, attachments, reports, handouts presentations and any other Document reflecting information considered by the committee at each such meeting;

    c.    Documents related to any board retreat, including minutes, agendas, attachments, reports, handouts, presentations, and any other Document reflecting information considered by the board at or in connection with each such retreat;

    d.    Documents reflecting any board actions taken outside of a board meeting;

    e.    Documents relating to the identification and recruitment of new board members, the election of officers of the board, and the removal or resignation of board members or officers; and

    f.    Documents relating to any invocation of any conflict of interest policy by any member of the board of directors in connection with any particular action, including documents Identifying the board member with the conflict and any other board members involved in any action related to the conflict, and documents showing the nature of the conflict and its resolution.

9.      All Documents reflecting communications to or from any member of the board of directors related to the Company's nonprofit mission, its programs, its finances, fundraising, compliance with the law, or the business of the board of directors specifically including any communications referring or relating to:

a. providing program services or benefits to any particular individual or entity;
b. fundraising and administrative costs;
c. hiring or retaining specific Fundraisers or fundraising consultants;
d. the Telemarketing Sales Rule, 16 C.F.R. Part 310;
e. complaints from individual Donors;
f. ratings or reviews of the Company;
g. media reports about the Company and its operations;
h. insurance coverage extending to Company officers, members, or directors;
i. payment or reimbursement for travel, meals, entertainment, or any personal expenses for individual board members, Employees, families of individual board members or Employees, or guests;
j. board-related training;
k. the performance and compensation of the Executive Director; and
l. conflicts of interest.
**Do not provide the Identity, PII, or SHI of any individual (i.e. non-entity) recipient of program services.**

## Compensation and Loans

10. All Documents that refer or relate to any monetary payment or other Compensation provided to any corporate officer or member of the board of directors (specifically including the Executive Director and the Director of Operations), or to any business entities owned or operated by such Persons), including but not limited to Compensation, lease, or rental payments, including documents that predate the Applicable Time Period but were operative and/or controlling during the Applicable Time Period.

11. All Documents used by the board of directors or any other Person to determine the Compensation, service or Employment terms and conditions for any corporate officer or member of the board of directors (specifically including the Executive Director and the Director of Operations), including documents that predate the Applicable Time Period but were operative and/or controlling during the Applicable Time Period.

12. All Documents that refer or relate to any loans made by the Company to any officer, Employee, or board member of the Company, or any first degree relative of the preceding (spouse, parent, sibling, child, or his/her spouse).

## Employees

13. Documents sufficient to show the organization of the Company's Employees and descriptions of each job position.

14. Documents sufficient to identify the Employment terms and conditions and total Compensation package for each Employee, including any Employment contracts.

15.     All Internal Revenue Service forms filed by the Company during the relevant time period, including IRS Forms W-2, Forms W-3, Forms 990, Forms 1023, Forms 1096, and Forms 1099.

### Company Finances and Oversight

16.     Documents sufficient to Identify each accountant or other Person with financial, accounting, or tax expertise, with whom the Company has consulted about its financial affairs.

17.     Each audit prepared by or on behalf of the Company and all Documents related thereto.

18.     Documents sufficient to show any periodic budget, general ledger, profit and loss statement, balance sheet, or other financial reporting Document for the Company.

19.     Documents relating to any checking, depository, savings, investment, credit card, debit card, charge card, loan, or other financial account in any bank, credit union, or other institution or service (including person-to-person (P2P) electronic funds transfer accounts (e.g. PayPal, Venmo, CashApp)) held in the name of the Company or otherwise holding funds on behalf of the Company, including the following:

    a.    account applications and related documents, including Documents that predate the Applicable Time Period but were operative and/or controlling during the Applicable Time Period;

    b.    signature cards, including Documents that predate the Applicable Time Period but were operative and/or controlling during the Applicable Time Period;

    c.    monthly statements;

    d.    general ledgers;

    e.    check registers;

    f.    savings account registers;

    g.    records of transfer of funds by wire or collection;

    h.    Documents relating to safe deposit boxes;

    i.    credit card processing agreements, including those that predate the Applicable Time Period but were operative and/or controlling during the Applicable Time Period; and

    j.    applications for purchase of manager's checks, cashier's checks, and/or treasurer's checks, together with the copies of the checks that were purchased, including Documents that predate the Applicable Time Period but were operative and/or controlling during the Applicable Time Period.

20.     Documents sufficient to show the Company's policies and practices regarding issuance and use of Company debit and credit cards, assignment of Company vehicles, and payment or reimbursement of travel, entertainment, or personal expenses, including Documents that predate the Applicable Time Period but were operative and/or controlling during the Applicable Time Period.

21.     Documents sufficient to Identify each Person who is or has been authorized to use a Company debit or credit card or a Company vehicle, or who has received payment or reimbursement for travel, entertainment, or personal expenses.

22.     For any real property owned by or for the benefit of the Company, Documents sufficient to show:

      a.     the location and postal address of the property;

      b.     the type of property (e.g. residential, commercial);

      c.     the value of the property;

      d.     the amount(s) of any mortgages or liens against the property, and the Identity of the applicable mortgagee or lienholder;

      e.     the amount and terms of any rent or other payment paid to the Company or any other Person for use or occupancy of the property;

      f.     the Identity of any occupant of the property; and

      g.     the Identity of the legal owner of the property, if the Company is not the legal owner.

23.     Documents sufficient to Identify any Person to whom the Company pays rent or otherwise reimburses for the use of office space or other space utilized by the Company and to show how the amount of rent or other reimbursement is calculated.

## Fundraising and Charitable Contributions

24.     All documents referring or relating to the Company's hiring, retention, evaluation, or termination of any Fundraiser to solicit on behalf of the Company, specifically including both internal communications about the Fundraiser and communications with the Fundraiser itself.

25.     All contracts or other Documents reflecting agreements related to the provision of fundraising services to the Company by third parties, including Fundraisers, fundraising consultants, caging companies, list management companies, and list brokers, including Documents that predate the Applicable Time Period but were operative and/or controlling during the Applicable Time Period.

26.     Documents sufficient to show the content of all solicitations used in connection with seeking Charitable Contributions to the Company, and the approval thereof by the Company, whether the solicitation material was used directly by the Company or by a third party on the Company's behalf, specifically including audio clips or other recorded messages, telephone scripts, direct mail pieces, newspaper advertisements, public service announcements on television or radio, electronic mail, short message service (SMS) or text messages, social media websites, Company websites, and other online environments, including Documents that predate the Applicable Time Period but were operative and/or controlling during the Applicable Time Period.

27.     For all solicitation materials used by or on behalf of the Company, Documents sufficient to show:

a. the date(s) that each particular solicitation material was in use;
b. the Identity of each entity or Person who designed, wrote, or advised the Company about the contents of the particular solicitation material; and
c. the Identity of each Fundraiser or other entity or Person that used the particular solicitation material.

28.     For each telemarketing script, audio clip, or other item of solicitation material used by or on behalf of the Company in telephone communications with Donors, Documents sufficient to show:

a. the number of telephone calls made or received where the telemarketing script, audio clip, and/or other solicitation material was used; and
b. the number and amount of Charitable Contributions received as a result of such calls.

29.     For each item of printed solicitation material mailed or physically distributed to a Donor, including direct mail solicitations, pledge cards, pamphlets, and thank you letters following a telemarketing call, Documents sufficient to show:

a. the number of each different item of solicitation material that was mailed or otherwise physically distributed; and
b. the number and amount of Charitable Contributions received as a result of or in connection with the mailing or distribution.

30.     For each item of electronic solicitation material that was e-mailed or otherwise electronically conveyed directly to a Donor, including e-mail solicitations, short message service (SMS) or text messages, pledge reminders, and thank you e-mails following a telemarketing call, Documents sufficient to show:

a. the number of each different item of electronic solicitation material that was distributed; and
b. the number and amount of Charitable Contributions received as a result of or in connection with the electronic solicitation material.

31.     For each item of web-based solicitation offering Donors an online mechanism to make Charitable Contributions to the Company, including websites, blog postings or articles featuring internet hyperlinks, and banner advertisements, documents sufficient to show:

a. the nature of the web-based solicitation;
b. the web page(s) at which the web-based solicitation was made available to Donors;
c. the time period during which the solicitation was available to Donors;
d. the number of page views for the solicitation; and
e. the number and amount of Charitable Contributions received as a result of or in connection with the solicitation.

32.     Documents sufficient to show each mailing address to which any Donor's Charitable Contribution to the Company has been directed and the Identity of the Person(s) responsible for receiving the mail at that address.

33.     Documents sufficient to show each telephone number provided to Donors in fundraising solicitations and the Identity of the Person(s) responsible for answering calls to or short message service (SMS) or text messages to that telephone number.

34.     All Documents referring or relating to the use of soundboard technology (also known as avatar technology) or other pre-recorded audio messages in connection with solicitations made on behalf of the Company by any Fundraiser or other Person.

35.     All Documents referring or relating to compliance by Fundraisers or other Persons soliciting or otherwise acting on behalf of the Company with the Telemarketing Sales Rule, 16 C.F.R. Part 310.

36.     All Documents reflecting communications by and between the Company and any Fundraiser or other person that has solicited Charitable Contributions on behalf of the Company relating to claims that the Fundraiser or other Person makes about the Company and its programs to Donors.

37.     All contracts and agreements related to the provision of services to enable Charitable Contributions to the Company (e.g. web-based platforms to enable donation of Gift(s)-in-Kind, stocks, and/or cryptocurrency, donations by investment fund distribution, donations by testimonial bequest or formation of charitable trust), including Documents that predate the Applicable Time Period but were operative and/or controlling during the Applicable Time Period.

38.     All Documents related to the Company's participation in the Combined Federal Campaign and any similar fundraising campaign directed at state employees.

39.     Documents sufficient to show whether the Company receives or has received Charitable Contributions for any restricted purpose and, if so, to show the restricted purpose and how restricted funds are collected and accounted for.

40.     Documents sufficient to show for each fundraising event sponsored or organized by or on behalf of the Company:

    a.   the date(s) and location(s) of the event;
    b.   the participants in the event;
    c.   any sponsors of the event;
    d.   the nature and purpose of the event and how it relates to the Company's mission;
    e.   the manner in which Charitable Contributions to the Company were collected in association with the event;

- 13 -

f.   the amount of Charitable Contributions collected at or as a result of the event;

g.   the net revenue or loss to the Company as a result of the event;

h.   the nature of and any revenue attributed to program services associated with the event;

i.   the Identity of the Company Employee(s) participating in or responsible for the event;

j.   all advertising or marketing about the event; and

k.   all Documents reflecting claims made by or about the fundraising event on any third-party website through which the Company makes representations about its program services, solicits or accepts Charitable Contributions, or seeks third parties to solicit Charitable Contributions on its behalf (e.g., websites such as Facebook, Causes, Crowdrise, etc.).

41.   All Documents reflecting claims made by or about the Company on any third-party website through which the Company makes representations about its program services, solicits or accepts Charitable Contributions, or seeks third parties to solicit Charitable Contributions on its behalf (e.g., websites such as Facebook, Instagram, Twitter, Pinterest, GoFundMe, etc.).

## Program Services

**Note: Do not produce any sensitive personally identifiable information ("Sensitive PII") or sensitive health information ("SHI"),** *see* **Instruction I-11 below, prior to discussing the information with FTC counsel. If any document responsive to a particular specification contains unresponsive Sensitive PII or SHI, redact the unresponsive Sensitive PII or SHI prior to producing the document or arrange with Counsel to provide the data in an encrypted format.**

42.   Documents sufficient to show the basis for the Company's Interrogatory responses relating to the Company's programs (see Interrogatory Nos. 23 through 26).

43.   All Advertisements or other Documents publicizing the availability to any potential recipient of any program service provided by the Company.

44.   Documents sufficient to show the accuracy and truthfulness of all claims about the Company and its programs made to any third party, including Donors, partner organizations, or governmental agencies (whether in solicitation materials, IRS Form 990s, audits, or by other means), specifically including but not limited to claims about:

a.   the use to which Donors' Charitable Contributions will be put;

b.   the particular charitable programs that will benefit from Donors' Charitable Contributions;

c.   the programs or services provided by the Company;

d.   the amount or percentage of each Charitable Contribution that will support any particular program;

e.   the location in which the Company provides its programs; and

      f.      the amount or percentage of each Charitable Contribution that will be used for administrative or fundraising expenses.

45.      All Documents referring or relating to the allocation of Employee Compensation to any program service in the Company's IRS Form 990.

### Donor Lists

46.      Documents sufficient to reflect the creation, maintenance, use, and rental of any list(s) of Donors to the Company, specifically including:

      a.      contracts with any list management company or other third party related to the Donor list;

      b.      communications by and between the Company and any entity that maintains a Donor list on the Company's behalf, including Fundraisers, list management or brokerage companies or other Persons, relating to the use of the Donor list by or on behalf of any third party;

      c.      records relating to the use of the Donor list by any related Person or entity;

      d.      any advertisements or other promotional documents describing the Donor list, its characteristics, rates for use of the list, and any restrictions on its use; and

      e.      any revenues or expenses related to the management or rental of the Donor list.

47.      Documents sufficient to show the Company's policies and practices related to the creation, maintenance, and/or provision of any list of Donors who do not wish to be contacted by the Company.

### Third Party Contacts

48.      All Documents related to any communication to or from any charity watchdog (e.g. Charity Navigator, GuideStar), the Better Business Bureau, or any other non-governmental consumer protection advocate involving the Company.

49.      All Documents reflecting internal communications within the Company or communications with a Fundraiser related to any complaint, inquiry, or other communication to or from a Donor regarding fundraising by or on behalf of the Company.

50.      All Documents reflecting communications received by the Company from any Donor or sent to a Donor in response to such a communication, specifically including:

      a.      physical or electronic correspondence received by the Company from any Donor;

      b.      phone logs, messages, or other records reflecting the nature of any telephone call received by the Company from a Donor; and

     c.      communications by and between the Company, or any of its Employees, and any Donor on a website that allows Donor comments and business responses, such as Facebook, Charity Navigator, Twitter, Great Nonprofits, or any other online venue where the Company has posted a comment or statement.

## Other Documents

51.     Documents sufficient to Identify all hospitals, nonprofit organizations, or other entities included in the "Network of 250 Hospitals" referenced by the Company, including in the Company's 2020 IRS form 990 (see Part III line 4b), and to show the nature of the Company's relationship with that entity, including whether any program services were provided to or with the assistance of the entity within the Applicable Time Period.

52.     Documents sufficient to Identify each of the Company's Corporate Partners, including all "Corporate Partners" identified on the Company's website, and to show the nature of the Company's relationship with each such Corporate Partner including:

     a.      whether the Company received any Charitable Contributions or services from that Corporate Partner;

     b.      the form and amount of any such Charitable Contributions; and

     c.      the nature or type of any such services.

53.     For the last ten years of the Company's operation, all non-privileged Documents reflecting, referring to, or relating to any investigation of the Company or enforcement action against the Company by any federal, state, or local enforcement or regulatory agency.

54.     For the last ten years of the Company's operation, communications between the Company and any federal, state, or local governmental agency.

55.     For any lawsuit by or against the Company, all Documents initiating the proceeding (e.g. legal complaint), terming the proceeding (e.g. order of dismissal), and memorializing sworn testimony by the Company or any of its board members or Employees in the proceeding (e.g. declarations, affidavits, deposition transcripts), including Documents that predate the Applicable Time Period.

## III.   DEFINITIONS

The following definitions apply to this CID:

D-1.     "**Company**," "**You**," or "**Your**" means Childhood Leukemia Foundation, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, members, employees, agents, consultants, and other Persons working for or on behalf of the foregoing.

D-2.    **"Document"** means the complete original, all drafts, and any non-identical copy, whether different from the original because of notations on the copy, different metadata, or otherwise, of any item covered by 15 U.S.C. § 57b-1(a)(5), 16 C.F.R. § 2.7(a)(2), or Federal Rule of Civil Procedure 34(a)(1)(A).

D-3.    **"Identify"** or **"the Identity of"** requires identification of (a) natural persons by name, title, present business affiliation, present business address, telephone number, and email address or, if a present business affiliation or present business address is not known, the last known business and home addresses; and (b) businesses or other organizations by name, address, and the identities of Your contact Persons at the business or organization.

D-4.    **"Advertisement"** or **"Advertising"** or **"Ad"** shall mean any written or verbal statement, illustration, or depiction that promotes the sale of a good or service or is designed to increase consumer interest in a brand, good, or service. Advertising media includes, but is not limited to: packaging and labeling; promotional materials; print; television; radio; and Internet, social media, and other digital content.

D-5.    **"Charitable Contribution"** shall mean any donation or gift of money or any other thing of value.

D-6.    **"Compensation"** shall mean all forms of cash and noncash payments or benefits of any value, including but not limited to salary and wages, bonuses, severance payments, deferred payments, retirement benefits, pay for unused sick leave and vacation leave, overtime, number of days off, including both vacation and sick time, and other reimbursements, arrangements or other transactions, including those that provide for privileges, memberships, personal and family educational benefits, below market loans, insurance premiums, personal or family travel, entertainment, meals, or housing, or personal use of the organization's property or assets, including, e.g., vehicles.

D-7.    **"Digital Communications Identifier"** shall mean any email address, instant messaging identifier, social network or forum user name, or any other unique user name or identifier for an online service that facilitates the sending of communications to or from a Person with access to the account.

D-8.    **"Donor"** shall mean any Person solicited to make a Charitable Contribution, including Persons who do not ultimately make a Charitable Contribution.

D-9.    **"Employ,"** **"Employed,"** and **"Employee(s)"** shall be construed to relate to any and all individuals whom you control or for whose work you direct the means and methods of accomplishing, regardless of whether or not the individual is employed full-time or parttime, is paid a salary or a commission, or is compensated by some other means, or is called an employee, agent, independent contractor, or staff member.

D-10.    **"Fundraiser"** shall mean any person or entity who is not a direct Employee of the Company who solicits Charitable Contributions on behalf of the Company in exchange for Compensation.

D-11. **"Gift(s)-in-Kind"** shall mean non-cash Charitable Contributions including donations of property, tangible or intangible, other than money. Non-cash Charitable Contributions include but are not limited to, stocks, bonds and other securities; real estate; works of art, stamps, coins, and other collectibles; clothing and household goods; vehicles, boats and airplanes; inventories of food, medical equipment or supplies, books or seeds; intellectual property, including patents, trademarks, copyrights and trade secrets; donated items that are sold immediately after donation such as publicly traded stock or used cars; and items donated for sale at a charity auction.

D-12. **"Person"** shall mean any individual, group, unincorporated association, limited or general partnership, corporation, or other business or nonprofit entity.

D-13. **"Telemarketing"** shall mean a plan, program, or campaign which is conducted to induce the purchase of goods or services or a Charitable Contribution, by use of one or more telephones and which involves more than one interstate telephone call.

## IV.   INSTRUCTIONS

I-1. **Petitions to Limit or Quash**: You must file any petition to limit or quash this CID with the Secretary of the FTC no later than twenty (20) days after service of the CID, or, if the return date is less than twenty (20) days after service, prior to the return date. Such petition must set forth all assertions of protected status or other factual and legal objections to the CID and comply with the requirements set forth in 16 C.F.R. § 2.10(a)(1) – (2). **The FTC will not consider petitions to quash or limit if You have not previously met and conferred with FTC staff and, absent extraordinary circumstances, will consider only issues raised during the meet and confer process.** 16 C.F.R. § 2.7(k); *see also* § 2.11(b). **If You file a petition to limit or quash, You must still timely respond to all requests that You do not seek to modify or set aside in Your petition.** 15 U.S.C. § 57b-1(f); 16 C.F.R. § 2.10(b).

I-2. **Withholding Requested Material / Privilege Claims**: For specifications requesting production of Documents or answers to written interrogatories, if You withhold from production any material responsive to this CID based on a claim of privilege, work product protection, statutory exemption, or any similar claim, You must assert the claim no later than the return date of this CID, and You must submit a detailed log, in a searchable electronic format, of the items withheld that identifies the basis for withholding the material and meets all the requirements set forth in 16 C.F.R. § 2.11(a) – (c). The information in the log must be of sufficient detail to enable FTC staff to assess the validity of the claim for each Document, including attachments, without disclosing the protected information. If only some portion of any responsive material is privileged, You must submit all non-privileged portions of the material. Otherwise, produce all responsive information and material without redaction. 16 C.F.R. § 2.11(c). The failure to provide information sufficient to support a claim of protected status may result in denial of the claim. 16 C.F.R. § 2.11(a)(1).

I-3.    **Modification of Specifications**: The Bureau Director, a Deputy Bureau Director, Associate Director, Regional Director, or Assistant Regional Director must agree in writing to any modifications of this CID.  16 C.F.R. § 2.7(l).

I-4.    **Scope of Search**: This CID covers Documents and information in Your possession or under Your actual or constructive custody or control, including Documents and information in the possession, custody, or control of Your attorneys, accountants, directors, officers, employees, service providers, and other agents and consultants, whether or not such Documents or information were received from or disseminated to any person or entity.

I-5.    **Identification of Responsive Documents**: For specifications requesting production of Documents, You must identify in writing the Documents that are responsive to the specification. Documents that may be responsive to more than one specification of this CID need not be produced more than once.  If any Documents responsive to this CID have been previously supplied to the FTC, You may identify the Documents previously provided and the date of submission.

I-6.    **Maintain Document Order**: For specifications requesting production of Documents, You must produce Documents in the order in which they appear in Your files or as electronically stored.  If Documents are removed from their original folders, binders, covers, containers, or electronic source, You must specify the folder, binder, cover, container, or electronic media or file paths from which such Documents came.

I-7.    **Numbering of Documents**: For specifications requesting production of Documents, You must number all Documents in Your submission with a unique identifier such as a Bates number or a Document ID.

I-8.    **Production of Copies**: For specifications requesting production of Documents, unless otherwise stated, You may submit copies in lieu of original Documents if they are true, correct, and complete copies of the originals and You preserve and retain the originals in their same state as of the time You received this CID.  Submission of copies constitutes a waiver of any claim as to the authenticity of the copies should the FTC introduce such copies as evidence in any legal proceeding.

I-9.    **Production in Color**: For specifications requesting production of Documents, You must produce copies of Advertisements in color, and You must produce copies of other materials in color if necessary to interpret them or render them intelligible.

I-10.    **Electronically Stored Information**: For specifications requesting production of Documents, see the attached FTC Bureau of Consumer Protection Production Requirements ("Production Requirements"), which detail all requirements for the production of electronically stored information to the FTC.  You must discuss issues relating to the production of electronically stored information with FTC staff **prior to** production.

I-11.    **Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI")**:  For specifications requesting production of Documents or answers to written interrogatories, if any responsive materials contain Sensitive PII or SHI, please contact FTC counsel before producing those materials to discuss whether there are steps You can take to

- 19 -

minimize the amount of Sensitive PII or SHI You produce, and how to securely transmit such information to the FTC.

Sensitive PII includes an individual's Social Security number; an individual's biometric data; and an individual's name, address, or phone number in combination with one or more of the following: date of birth, driver's license or state identification number (or foreign country equivalent), military identification number, passport number, financial account number, credit card number, or debit card number. Biometric data includes biometric identifiers, such as fingerprints or retina scans, but does not include photographs (with the exception of photographs and corresponding analyses used or maintained in connection with facial recognition software) or voice recordings and signatures (with the exception of those stored in a database and used to verify a person's identity). SHI includes medical records and other individually identifiable health information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

I-12.   **Interrogatory Responses**: For specifications requesting answers to written interrogatories: (a) answer each interrogatory and each interrogatory subpart separately, fully, and in writing; and (b) verify that Your answers are true and correct by signing Your answers under the following statement: "I verify under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)." The verification must be submitted contemporaneously with Your interrogatory responses.

I-13.   **Submission of Documents in Lieu of Interrogatory Answers**: You may answer any written interrogatory by submitting previously existing Documents that contain the information requested in the interrogatory so long as You clearly indicate in each written interrogatory response which Documents contain the responsive information. For any interrogatory that asks You to identify Documents, You may, at Your option, produce the Documents responsive to the interrogatory so long as You clearly indicate the specific interrogatory to which such Documents are responsive.

## CERTIFICATION OF COMPLIANCE
### Pursuant to 28 U.S.C. § 1746

I, _____, certify the following with respect to the Federal Trade Commission's ("FTC") Civil Investigative Demand directed to Childhood Leukemia Foundation, Inc. (the "Company") (FTC File No. 2223073) (the "CID"):

1.    The Company has identified all documents, information, and/or tangible things ("responsive information") in the Company's possession, custody, or control responsive to the CID and either:

        (a) provided such responsive information to the FTC; or

        (b) for any responsive information not provided, given the FTC written objections setting forth the basis for withholding the responsive information.

2.    I verify that the responses to the CID are complete and true and correct to my knowledge.

I certify under penalty of perjury that the foregoing is true and correct.

Date: _____

_____
Signature

_____
Printed Name

_____
Title

## CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY
### Pursuant to 28 U.S.C. § 1746

1.    I, _____ , have personal knowledge of the facts set forth below and am competent to testify as follows:

2.    I have authority to certify the authenticity of the records produced by Childhood Leukemia Foundation, Inc. (the "Company") and attached hereto.

3.    The documents produced and attached hereto by the Company are originals or true copies of records of regularly conducted activity that:

   a)    Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

   b)    Were kept in the course of the regularly conducted activity of the Company; and

   c)    Were made by the regularly conducted activity as a regular practice of the Company.

I certify under penalty of perjury that the foregoing is true and correct.


Date: _____          _____
                                      Signature

## Federal Trade Commission - Bureau of Consumer Protection
### Production Requirements
Revised July 2020

In producing information to the FTC, comply with the following requirements, unless the FTC agrees otherwise. If you have questions about these requirements, please contact FTC counsel before production.

## Production Format

1. **General Format**: Provide load-ready electronic productions with:

   a. A delimited data load file (.DAT) containing a line for every document, unique id number for every document (DocID), metadata fields, and native file links where applicable; and

   b. A document level text file, named for the DocID, containing the text of each produced document.

      Do not produce corresponding image renderings (e.g., TIFF or JPEG) for files in native format unless the FTC requests them. If the FTC requests corresponding image renderings, provide an Opticon image load file (.OPT) containing a line for every image file.

2. **Electronically Stored Information (ESI)**: Documents stored in electronic format in the ordinary course of business must be produced in the following format:

   a. For ESI other than the categories below, submit in native format with all metadata and either document level extracted text or Optical Character Recognition (OCR). Do not produce corresponding image renderings (e.g., TIFF or JPEG) for files in native format unless the FTC requests them. If the FTC requests corresponding image renderings, they should be converted to Group IV, 300 DPI, single-page TIFF (or color JPEG images when necessary to interpret the contents or render them intelligible.)

   b. For Microsoft Excel, Access, or PowerPoint files, submit in native format with extracted text and metadata. Data compilations in Excel spreadsheets or delimited text formats must contain all underlying data, formulas, and algorithms without redaction.

   c. For other spreadsheet, database, presentation, or multimedia formats; instant messages; or proprietary applications, discuss the production format with FTC counsel.

3. **Hard Copy Documents**: Documents stored in hard copy in the ordinary course of business must be scanned and submitted as either one multi-page pdf per document or as 300 DPI single page TIFFs (or color JPEGs when necessary to interpret the contents or render them intelligible), with corresponding document-level OCR text and logical document determination in an accompanying load file.

4. **Document Identification**: Provide a unique DocID for each hard copy or electronic document, consisting of a prefix and a consistent number of numerals using leading zeros. Do not use a space to separate the prefix from numbers.

5. **Attachments**: Preserve the parent/child relationship by producing attachments as separate documents, numbering them consecutively to the parent email, and including a reference to all attachments.

6. **Metadata Production**: For each document submitted electronically, include the standard metadata fields listed below in a standard delimited data load file. The first line of the data load file shall include the field names. <u>Submit date and time data in separate fields</u>. Use these standard Concordance delimiters in delimited data load files:

| Description | Symbol | ASCII Character |
|---|---|---|
| Field Separator | ¶ | 20 |
| Quote Character | þ | 254 |
| Multi Entry delimiter | ® | 174 |
| <Return> Value in data | ~ | 126 |

7. **De-duplication**: Do not use de-duplication or email threading software without FTC approval.

8. **Password-Protected Files**: Remove passwords prior to production. If password removal is not possible, provide the original and production filenames and the passwords, under separate cover.

<u>**Producing Data to the FTC**</u>

1. Prior to production, scan all data and media for viruses and confirm they are virus-free.

2. For productions smaller than 50 GB, submit data electronically using the FTC's secure file transfer protocol. Contact FTC counsel for instructions. **The FTC cannot accept files via Dropbox, Google Drive, OneDrive, or other third-party file transfer sites.**

3. If you submit data using physical media:

   a. Use only CDs, DVDs, flash drives, or hard drives. Format the media for use with Windows 7;

   b. Use data encryption to protect any Sensitive Personally Identifiable Information or Sensitive Health Information (as defined in the instructions), and provide passwords in advance of delivery, under separate cover; and

   c. Use a courier service (e.g., Federal Express, UPS) because heightened security measures delay postal delivery.

4. Provide a transmittal letter with each production that includes:

   a. Production volume name (e.g., Volume 1) and date of production;

   b. Numeric DocID range of all documents in the production, and any gaps in the DocID range; and

   c. List of custodians and the DocID range for each custodian.

**Standard Metadata Fields**

| DAT FILE FIELDS | DEFINITIONS | POPULATE FIELD FOR: |
|---|---|---|
| DocID | Unique ID number for each document | All Documents |
| FamilyID | Unique ID for all documents in a family including parent and all child documents | All Documents |
| ParentID | Document ID of the parent document. This field will only be populated on child items | All Documents |
| File Path | Path to produced native file | All Documents |
| TextPath | Path to document level text or OCR file | All Documents |
| Custodian | Name of the record owner/holder | All Documents |
| AllCustodians | Names of all custodians that had copy of this record (populate if data was deduplicated or email threading was used) | All Documents |
| Source | Source of documents: CID, Subpoena, Third Party Data, etc. | All Documents |
| Filename | Original file name | All Documents |
| File Size | Size of documents | All Documents |
| File Extensions | Extension of file type | All Documents |
| MD5 Hash | Unique identifier for electronic data used in de-duplication | All Documents |
| PRODUCTION_VOLUME | Production Volume | All Documents |
| HASREDACTIONS | Redacted document | All Documents |
| Exception Reason | Reason for exception encountered during processing (e.g., empty file, source file, password-protected file, virus) | All Documents |
| PRODBEG | Beginning production bates number | Documents with Produced Images |
| PRODEND | Ending production bates number | Documents with Produced Images |
| PRODBEG_ATTACH | Beginning production family bates number | Documents with Produced Images |
| PRODEND_ATTACH | Ending production family bates number | Documents with Produced Images |
| Page Count | The number of pages the document contains | Documents with Produced Images |
| From | Names retrieved from the FROM field in a message | Emails |
| To | Names retrieved from the TO field in a message; the recipient(s) | Emails |
| CC | Names retrieved from the CC field in a message; the copied recipient(s) | Emails |
| BCC | Names retrieved from the BCC field in a message; the blind copied recipient(s) | Emails |
| EmailSubject | Email subject line | Emails |
| Date Sent | The date an email message was sent | Emails |
| Time Sent | The time an email message was sent | Emails |
| Date Received | The date an email message was received | Emails |
| Time Received | The time an email message was received | Emails |
| Author | File Author | Loose Native Files and Email Attachments |
| Title | File Title | Loose Native Files and Email Attachments |
| Subject | File Subject | Loose Native Files and Email Attachments |
| Date Created | Date a document was created by the file system | Loose Native Files and Email Attachments |
| Time Created | Time a document was created by the file system | Loose Native Files and Email Attachments |
| Date Modified | Last date a document was modified and recorded by the file system | Loose Native Files and Email Attachments |
| Time Modified | Last time a document was modified and recorded by the file system | Loose Native Files and Email Attachments |
| Date Printed | Last date a document was printed and recorded by the file system | Loose Native Files and Email Attachments |
| Time Printed | Last time a document was printed and recorded by the file system | Loose Native Files and Email Attachments |

UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:      Joseph J. Simons, Chairman
                            Maureen K. Ohlhausen
                            Noah Joshua Phillips
                            Rohit Chopra
                            Rebecca Kelly Slaughter


## RESOLUTION DIRECTING USE OF COMPULSORY PROCESS IN A NON-PUBLIC INVESTIGATION OF DECEPTIVE FUNDRAISING

**File No. 132 3286**

Nature and Scope of Investigation:

To determine whether unnamed persons, partnerships, corporations, or others in connection with soliciting charitable contributions, donations, or gifts of money or any other thing of value, have engaged in or are engaging in (1) deceptive or unfair acts or practices in or affecting commerce in connection with soliciting charitable contributions, donations, or gifts of money or any other thing of value in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and/or (2) deceptive or abusive telemarketing acts or practices in violation of the Commission's Telemarketing Sales Rule, 16 C.F.R. Part 310. The investigation is also to determine whether Commission action to obtain monetary equitable relief for injury to consumers or others would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation for a period not to exceed five (5) years from the date of issuance of this resolution. The expiration of this five-year period shall not limit or terminate the investigation or the legal effect of any compulsory process issued during the five-year period. The Federal Trade Commission specifically authorizes the filing or continuation of actions to enforce any such compulsory process after the expiration of the five-year period.

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50, and 57b-1; and FTC Procedures and Rules of Practice, 16 C.F.R. § 1.1 *et seq.*, and supplements thereto.

By direction of the Commission.

                                    Donald S. Clark
                                      Secretary

**Issued: September 14, 2018**

# **<u>EXHIBIT B</u>**

EXHIBIT
**B**

UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:      Lina M. Khan, Chair
                    Rebecca Kelly Slaughter
                    Christine S. Wilson
                    Alvaro M. Bedoya

_____
                                        )
In the Matter of                        )
                                        )
AUGUST 11, 2022, CIVIL INVESTIGATIVE DEMAND   )      Matter No. 222 3073
ISSUED TO CHILDHOOD LEUKEMIA FOUNDATION,  )
INC.                                    )
                                        )
                                        )
_____)

ORDER DENYING PETITION TO QUASH
CIVIL INVESTIGATIVE DEMAND

**By WILSON, Commissioner:**

Childhood Leukemia Foundation, Inc. ("CLF") has filed a petition to quash a Civil
Investigative Demand ("CID") issued by the Commission on August 11, 2022.[1] For the reasons
stated below, the petition is denied.

I.      INTRODUCTION

CLF is organized as a non-profit corporation under New Jersey law and has been granted
an exemption from federal taxation under Section 501(c)(3) of the Internal Revenue Code.[2] In its
IRS Form 990s, CLS states that its mission is "to educate, empower and lift the spirits of
children suffering with the devastating effects of cancer throughout the United States."[3] It
operates four main programs: "Keeping Kids Connected iPads," which provides iPads to
children with cancer, "Hope Binders," which have sections to reference and record medical
information, "Hugs U Wear," which provides custom made human hair wigs, and "Wish
Baskets," which contain age-appropriate items to help children learn and cope with anxiety and
boredom associated with cancer treatment and hospitalization.[4]

---

[1] "Pet." refers to CLF's Petition to Quash and the exhibits attached thereto. Citations are to page numbers of the .pdf
file submitted to the Commission.

[2] *See* Pet. at 14, 20-28.

[3] *E.g.*, Pet. at 192.

[4] Pet. at 15-17.

Over the past three years, more than 99% of CLF's revenue has come from public charitable donations obtained through fundraisers and solicitations.[5] According to its Form 990s, between 2019 and 2021, CLF received contributions and grants totaling about $11.5 million, but spent about $9.1 million on fundraising expenses, plus another $1.3 million in employee compensation, most of which was paid to two executives.[6] Thus it appears from forms filed with the IRS that more than 90% of CLF's fundraising revenue was spent on fundraising and employee compensation. Comparatively little was spent on CLF's programs. For example, the 2021 Form 990 indicates that CLF spent $126,313 on the iPad program and $43,703 on the wish basket program, or about 3.6% and 1.2% of total fundraising contributions, respectively.[7] For comparison, CLF reported total compensation of $309,819 to its two highest-paid employees (its executive director and chief operating officer), representing about 8.8% of fundraising contributions.[8]

The Commission is conducting an investigation to determine whether CLF is engaged in "unfair or deceptive acts or practices" in violation of Section 5 of the FTC Act, 15 U.S.C. § 45. The investigation centers on whether CLF's program spending is so *de minimis* that it is deceptive to tell consumers that their money will be spent on the purported charities described to them. The Commission is also investigating whether CLF is violating the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, by assisting and facilitating paid fundraisers who make deceptive solicitations of charitable donations on behalf of CLF, and who in some instances may engage in robocalling (*i.e.*, calling consumers to play a prerecorded message).

On August 11, 2022, under the authority of a Commission resolution authorizing the use of compulsory process, the Commission issued a CID to CLF pursuant to Section 20 of the FTC Act, 15 U.S.C. § 57b-1.[9] The CID seeks information about its fundraising representations and about how it spends donated funds. It also seeks information about CLF's governance and operations, which is relevant to the Commission's determination as to whether CLF qualifies as a "corporation" within the meaning of Section 4 of the FTC Act, 15 U.S.C. § 44. *See* discussion below.

The return date for the CID was September 12, 2022. Under the Commission's rules, a petition to quash was initially due on August 31, 2022, *see* 16 C.F.R. § 2.10, but Commission staff granted an extension until September 9, 2022.[10] After meeting and conferring with

---

[5] Pet. at 17.

[6] Pet. at 152, 158, 192, 198, 234, 240.

[7] Pet. at 243.

[8] Pet. at 240-41.

[9] The CID states that the subject of the investigation is whether CLF "committed violations of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) and/or committed violations of the Commission's Telemarketing Sales Rule, 16 C.F.R. Part 310, relating to the solicitation of charitable donations, and whether Commission action to obtain monetary relief would be in the public interest."

[10] Pet. at 302.

Commission staff, CLF filed a petition on that date asking the Commission to quash the CID in its entirety.

## II.      ANALYSIS

CLF argues that it is a non-profit corporation so the Commission lacks jurisdiction to issue and serve the CID and may not compel CLF to comply with the CID.[11] This argument hinges upon Section 4 of the FTC Act, which provides in relevant part that the term "corporation" shall be deemed to include any company "without shares of capital or capital stock or certificates of interest, except partnerships, which is organized to carry on business for its own profit or that of its members." 15 U.S.C. § 44. CLF relies upon *Community Blood Bank v. FTC*, 405 F.2d 1011 (8th Cir. 1969), which held that the Commission lacked jurisdiction to enforce Section 5 of the FTC Act against a corporation where the evidence showed that the corporation was not engaged in business for profit. *Id.* at 1018-20.

CLF's arguments fail for two reasons. First, the plain language of Section 20 permits the Commission to serve a CID on any legal entity, regardless of whether it is a "corporation" within the meaning of Section 4. Second, as *Community Blood Bank* and other cases make clear, an organization's form of incorporation and tax-exempt status is not controlling for purposes of whether the organization is a "corporation" within the meaning of Section 4. The Commission is entitled to determine for itself whether CLF is in fact operating as a nonprofit entity, and it needs the information sought in the CID to make that determination.

### A.      The Commission Has Authority Under Section 20 To Serve a CID on Any Legal Entity.

CLF argues that if it is not a "corporation" within the meaning of Section 4, then the Commission lacks authority to serve a CID under Section 20.[12] The plain language of the FTC Act refutes this argument. Section 20 authorizes the Commission to serve a CID on any "person." 15 U.S.C. § 57b-1(c).[13] "Person" is defined as "any natural person, partnership, corporation, association, or *other legal entity*, including any person acting under color or authority of State law." *Id.* § 57b-1(a)(6) (emphasis added). Regardless of whether CLF is a "corporation" under Section 4, it certainly is a "legal entity." CLF does not argue otherwise.

As prior Commission decisions have recognized, the Commission's investigatory authority under Section 20 is broader than its enforcement authority under Section 5. For example, the Commission "can require production of material from an entity that is not subject to

---

[11] Pet. at 4.

[12] Pet. at 5-7.

[13] Section 20(c)(1) provides: "Whenever the Commission has reason to believe that any person may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title), or to antitrust violations, the Commission may, before the institution of any proceedings under this subchapter, issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such documentary material for inspection and copying or reproduction, to submit such tangible things, to file written reports or answers to questions, to give oral testimony concerning documentary material or other information, or to furnish any combination of such material, answers, or testimony." 15 U.S.C. § 57b-1(c)(1).

3

the Commission's enforcement authority if that material furthers the investigation of possibly illegal conduct by entities that are subject to the agency's jurisdiction, such as for-profit telemarketers making calls on [the CID recipient's] behalf." *In re Feature Films for Families*, 150 F.T.C. 866, 870 (2010). And the Commission "also possesses the authority to investigate whether its jurisdiction extends to [the CID] recipient." *Id.* at 871; *see also In re March 19, 2014 Civil Investigative Demand Issued to Police Protective Fund, Inc.*, 157 F.T.C. 1913, 1919-20 (2014).[14]

Since there is no dispute that CLF is a legal entity, it is a "person" within the meaning of Section 20 of the FTC Act and may properly be issued a CID.

**B.     The Information Sought in the CID Is Needed To Enable the Commission To Determine Whether CLF Is Operated as a Nonprofit.**

CLF also argues that it is "unquestionable" that it is "a charitable non-profit corporation" that is outside of the Commission's enforcement jurisdiction.[15] It has submitted evidence supporting this assertion in the form of a declaration from CLF's executive director with voluminous exhibits attached.[16] But this argument puts the cart before the horse. The Commission cannot determine whether CLF is truly operated as a nonprofit, and hence is outside Section 4's definition of "corporation," without reviewing the information requested in the CID.

The law is clear that just because a corporation is organized as a nonprofit entity under state law and has been granted tax-exempt status does not mean that it is not a "corporation" under Section 4. *See Community Blood Bank*, 405 F.2d 1018-19 ("[W]e do not mean to hold or even suggest that the charter of a corporation and its statutory source are alone controlling."); *FTC v. AmeriDebt, Inc.*, 343 F. Supp. 2d 451, 460 (D. Md. 2004) ("Although AmeriDebt is incorporated as a non-stock corporation with tax-exempt status, the Court finds this insufficient to insulate it from the regulatory coverage of the FTC Act."). It is equally clear that the Commission has the power to investigate the facts to determine whether an organization is subject to its regulatory jurisdiction.[17] Thus a party "may not normally resist [investigative process] on the grounds that the agency lacks regulatory jurisdiction." *FTC v. Ken Roberts Co.*,

[14] CLF argues that *Police Protective Fund* was wrongly decided, and that the CID recipient there did not "bring the inherent limitations of the Commission's jurisdiction to issue CIDs ... to the Commission's attention." Pet. at 7. But as discussed above, the plain text of Section 20 provides that the Commission may issue a CID to any legal entity, regardless of whether it is a "corporation" under Section 4.

[15] Pet. 9.

[16] *See* Pet. at 14-269. These exhibits include (1) certificates of amendment to CLF's articles of incorporation, (2) a letter from the IRS confirming CLF's status as a tax-exempt entity under Section 501(c)(3), (3-6) lists of children who received iPads, Hope Baskets, wigs, or Wish Baskets from 2019 through August 24, 2022, (7) requests and appreciation letters from children, hospital social workers, and others, (8) and CLF's Form 990s for 2019 to 2021.

[17] *See, e.g.*, *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 627 (1973) (agency's "jurisdiction to determine whether it has jurisdiction is as essential to its effective operation as is a court's like power."); *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943) (where evidence sought in agency subpoena "was not plainly incompetent or irrelevant to any lawful purpose of the [agency] ... it was the duty of the District Court to order its production."); *Fed. Mar. Comm'n v. Port of Seattle*, 521 F.2d 431, 434 (9th Cir. 1975) ("[E]ach independent regulatory administrative agency has the power to obtain the facts requisite to determining whether it has jurisdiction over the matter sought to be investigated.").

4

276 F.3d 583, 586 (D.C. Cir. 2001) (quoting *FTC v. Ernsthal*, 607 F.2d 488, 490 (D.C. Cir. 1979).

CLF acknowledges that its corporate form and tax-exempt status are not determinative of whether it is truly a nonprofit organization. It cites the two-pronged test the Commission has employed for analyzing this question, which looks to both the source and destination of an organization's income.[18] *See In re College Football Ass'n*, 117 F.T.C. 971, 998 (1994) ("The not-for-profit jurisdictional exemption under Section 4 requires both that there be an adequate nexus between an organization's activities and its alleged public purposes and that its net proceeds be properly devoted to recognized public, rather than private, interests."); *see also In re California Dental Ass'n*, 121 F.T.C. 190, 290 (1996) ("[A]n organization that falls short on either prong comes within our jurisdiction."), *aff'd*, 128 F.3d 720 (9th Cir. 1997), *and aff'd* in relevant part, 526 U.S. 756, 765-69 (1999). CLF argues that the evidence it has submitted demonstrates that it satisfies this test.[19]

The problem with this argument is that the Commission cannot make that determination at this stage of proceedings based solely on the evidence that CLF has voluntarily supplied in an effort to avoid compliance with the CID. As we explained in *Police Protective Fund*, "the Commission is not required to take at face value an organization's claim that it is a charitable organization and can require it to produce documents and other information to enable the Commission to make that determination for itself." *Police Protective Fund*, 157 F.T.C. at 1916. CLF "cannot foreclose that inquiry simply by asserting that, *if* conducted, the inquiry would yield facts favorable to [it]." *Id.* at 1917.

Here, as in *Police Protective Fund*, the Commission will conduct a careful examination to determine whether CLF is in fact carrying on business "for its own profit or that of its members." 15 U.S.C. § 44. The Commission may take into account CLF's form of organization and tax-exempt status, but as discussed above those factors are not dispositive. Rather, the Commission "will conduct a fact-intensive inquiry into how the corporation actually operates," including examination of "the primary purpose of the organization, the extent to which funds or benefits may have been conferred on related for-profit companies or individuals, and the extent to which the organization may have been used by individuals or for-profit entities as a device to seek monetary gain." *Police Protective Fund*, 157 F.T.C. at 1917-18. For purposes of this inquiry, '[t]he extent to which an entity confers benefits on private interests is relevant even if those benefits are not in the form of 'profits' as that term is traditionally understood." *Id.* at 1918.[20]

---

[18] Pet. at 8.

[19] Pet. at 9-11.

[20] *See also FTC v. Gill*, 183 F. Supp. 2d 1171, 1184-85 (C.D. Cal. 2001) (company was "not a legitimate nonprofit organization" where evidence showed individual defendant lived in corporate office, paid personal expenses from corporate account, and otherwise commingled assets); *In re Ohio Christian Coll.*, 80 F.T.C. 815, 848 (1972) ("Profit, for the purpose of Section 4 of the Federal Trade Commission Act, is not limited to dividends, gains or direct reward."); *cf. Liu v. SEC*, 140 S. Ct. 1936, 1946, 1950 (2020) (expenses such as "extraordinary salaries" may amount to "dividends of profit under another name.").

5

In sum, the Commission is not required simply to accept CLF's representation that it is a nonprofit based on CLF's selective presentation of evidence. It needs the information requested in the CID to determine whether CLF is truly operated as a nonprofit such that it is not a "corporation" within the meaning of Section 4.

## III.   CONCLUSION

For all the foregoing reasons, **IT IS HEREBY ORDERED THAT** the Petition to Quash Civil Investigative Demand filed by Childhood Leukemia Foundation, Inc., be, and it hereby is, **DENIED.**

**IT IS FURTHER ORDERED** that Childhood Leukemia Foundation, Inc., comply in full with the Commission's Civil Investigative Demand on or before October 31, 2022.

By the Commission.

April J. Tabor
Secretary

Issued:  October 19, 2022

6